REVISED, FEBRUARY 14, 2000

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-50471
_____

WALTER W. MCALLISTER, III, an Individual; GERRY SOLCHER, an
Individual; ROBERT CUYLER, an Individual,

Plaintiffs-Appellants,

v.

RESOLUTION TRUST CORPORATION, as Receiver for San Antonio
Savings Association, F.A.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
January 21, 2000

Before GARWOOD, SMITH, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Appellants, three former executives of the now-defunct San
Antonio Savings Association, appeal from the district court's
grant of summary judgment to the Resolution Trust Corporation[1]
("RTC") with respect to their claimed right to receive payment

_____

[1] The Resolution Trust Corporation ceased all operations on
December 31, 1995, pursuant to 12 U.S.C. § 1441a(m)(1). The
Federal Deposit Insurance Corporation is named in the relevant
statute as successor to the former RTC. This succession occurred
subsequent to the matters that give rise to this current
litigation. As such, for the sake of consistency, we refer to
the appellee throughout this opinion as the RTC.

1

under a Supplemental Executive Retirement Plan ("SERP"). Because we find that the district court correctly determined the legal issues in this case, and appellants have failed to raise any genuine issues of material fact in support of their position, we affirm.

## I. Factual and Procedural Background

The background facts in this case are largely undisputed.[2] This controversy is born of the demise of what was formerly known as the San Antonio Savings Association ("SASA"), a federally insured thrift. Appellants each held executive positions at the thrift. Walter McAllister was Chairman of the Board and Chief Executive Officer; Gerry Solcher was SASA's President; and Robert Cuyler was the thrift's Operations Officer. As executives employed by SASA, appellants each participated in a Supplemental Executive Retirement Plan ("SERP"), designed to provide benefits to top management in addition to those available to all eligible employees under the usual qualified pension plans.

The SERP plan differed from usual pension plans in that the executives made no contribution to it. The plan was funded exclusively by an Umbrella Trust, containing life insurance policies on the lives of the executives. As SASA owned the

---

[2] It bears mentioning at the outset that this case is before us for the second time on appeal. See McAllister v. FDIC, 87 F.3d 762 (5th Cir. 1996). While we do not now take issue with the previous factual recitation offered by this Court, for the purposes of examining the legal issues now before us, we offer a restatement of the factual background leading up to this appeal, with an emphasis on those matters the parties now contend should result in different outcomes under the relevant law.

policies and paid all policy premiums, SASA was able to structure the SERP as an unfunded "grantor" or "rabbi" trust. As an unfunded, non-contributory plan, initial payments to the trust, and income generated by the trust, remained taxable to the employer rather than to the employee. This trust structure allowed the participants to defer tax liability on their individual shares until asset distribution under the terms of the plan.

The thrift began experiencing financial difficulty in late 1988. These difficulties led to the transformation of the thrift a number of times. The first such transformation occurred on February 28, 1989, when SASA was placed in conservatorship. At this time, the RTC chose to carry on SASA's operations, and requested SASA's senior executives, appellants in this matter, stay on in their former positions. As a result, appellants managed the thrift in conservatorship for about six months, until July 1989, when regulators decided to close SASA and replace the conservator with a receiver.

A new institution, San Antonio Savings Association, Federal Association ("SASA, FA"), was established at that time. SASA, FA was chartered and placed in conservatorship by federal regulators on July 13, 1989, to acquire substantially all of SASA's assets and deposit liabilities. The executives again stayed on as employees of the successor conservatorship from July 1989, until March 1990, when regulators closed SASA, FA, and appointed the RTC as the thrift's Receiver. The Receiver then proceeded to

liquidate SASA, FA's assets for the benefit of depositors and creditors.

Two executives, not appellants in this matter, opted for early retirement during the first conservator phase. As the thrift was not yet in insolvency and was not yet at the phase of distribution, these executives received their vested SERP benefits in full, without controversy.

It is clear that no written contract governed the employment relationship between appellants and the SASA and SASA, FA conservatorships. The RTC maintains that the conservatorships continued to pay appellants their salaries, as well as their health, vacation, and pension benefits, in the ordinary course of business, as orally agreed to by the parties. Appellants do not disagree with this contention, although there is some factual dispute as to the amount of salary received.[3]

The factual recitations of the opposing parties diverge when the discussion turns to representations made concerning the legal status of the SERP benefits. The RTC maintains, as stated above, that the only representation made concerning these benefits was that the Conservator was committed to continue payment of all salary and benefits in full, throughout the conservatorship phase.

Appellants paint a different picture. Specifically, they

---

[3] The RTC concedes that Solcher experienced a salary reduction at some point during his employment with the SASA, FA conservatorship.

4

maintain that the Conservator orally contracted to pay their SERP benefits in full, as an expense of administration, as an inducement for appellants to continue employment with the SASA conservatorship and its successors.

Regardless of how these benefits were characterized by the parties, it is clear that the SASA, FA conservatorship adopted the SERP benefit plan as it existed prior to regulatory intervention. Specifically, the Conservator executed documents entitled "Adoption by San Antonio Savings Association, FA of the Supplemental Executive Retirement Plan, The Executive Deferred Compensation Plan, and the Umbrella Trust." Importantly, however, the document of adoption does not modify the plan's language in any respect, except with regard to the grantor-employer: SASA, FA is substituted for SASA in the old document. Additionally, loans on the various policies supporting the plan were authorized to maintain the trust.

When SASA, FA was placed in receivership, the RTC notified the trustee for the Umbrella trust that the policies in the trust should be liquidated so the assets could be used to pay SASA, FA's creditors. Appellants received notice in December 1991, after the placement of SASA, FA in receivership, as to the status of their claims for payment under the SERP. Specifically, the notice letter reminded all plan participants that the SERP was a "nonqualified" retirement plan and all plan participants remained unsecured general creditors. As such, continued the notice, participants never acquired any rights to these policies and

5

accordingly would not receive any benefit from them, as the assets were needed to pay creditors. Participants were invited, however, to submit any claims or questions concerning the plan to the Receiver.

Appellants each filed claims. McAllister claimed $1,871,209.53; Solcher claimed $1,049,811.50; and Cuyler claimed $457,234.57. In March 1993, the Receiver allowed the claims and issued receiver's certificates to each of the executives in the full amount claimed. Following a Freedom of Information Act request for information on the creditors of SASA, FA, Cuyler learned that there were approximately $103,000.00 in outstanding unsecured claims and that there would be several million dollars available after all superior claims against the failed institution were paid in full. However, this estimate proved incorrect and in fact the RTC was still owed over one billion dollars to pay depositors in full upon exhaustion of all existing funds.

Appellants persisted, and filed new proofs of claims approximately one year later. Again, in a letter dated April 4, 1994, Appellants were informed that although they held valid certificates, "[a]ll claims of the depositors and all claims subrogated to the RTC must be paid in their entirety before any payment can be made on the claims of the general trade creditors. . . [i]f deposit claims are paid in full, then [you] will be in line with other unsecured creditors to begin receiving [your] pro rata share of dividend payments. . . ."

6

Appellants filed suit, in November 1994, challenging the

RTC's determination of the proper priority status to be accorded their claims for payment under the SERP. The district court granted the RTC's motion to dismiss under Fed. R. Civ. P. 12(b)(6), in May 1995, as untimely, and thus for lack of jurisdiction. This Court reversed the dismissal and remanded the case to the district court for further proceedings. See McAllister, 87 F.3d at 766.

On remand, upon conducting extensive discovery, the district court granted summary judgment in favor of the RTC. This timely appeal followed.

## II.  Standard of Review

This Court reviews the grant of summary judgment de novo, evaluating the case under the same standards employed by the district court. S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996).

Summary judgment is proper, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputed facts preclude summary judgment if the evidence would allow a reasonable jury to return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Although we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party

8

may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial." Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 505 (5th Cir. 1999), petition for cert. filed (Dec. 28, 1999) (No. 99-1090).

## III. Analysis

In this case, appellants assert several grounds upon which summary judgment was improper. As their primary objection, appellants assert that an oral contract existed which classified the SERP benefits as an expense of administration. Such a classification, they further contend, should result in a first priority debt, payable by the RTC prior to payment of any depositor claims. Alternatively, appellants contend that estoppel and law of the case require this Court to overturn summary judgment. As appellants bear the burden of demonstrating that there exist genuine issues of material fact, we first address the language of the agreements now at issue, then address the specific arguments appellants offer as demonstrative of error on the part of the district court.

## A. The language of the plan

As stated above, the Supplemental Executive Retirement Plan was designed by SASA executives with a particular goal in mind: deferment of tax liability. To this end, the SERP was structured such that all plan assets would be maintained in an unfunded "grantor" trust. Grantor trusts of this nature permit participants to postpone tax liability to be assessed against

9

SERP benefits until trust assets are actually distributed, presumably at the time of retirement.

In order to maintain this deferred tax status, the Internal Revenue Code requires beneficiaries to hold only a limited interest in the trust assets prior to distribution. Specifically, the Code requires that all trust assets be property of the employer, and therefore subject to the claims of creditors of the employer. 26 U.S.C. § 671 *et sec.* This requirement renders trusts so formed unfunded.

In accordance with the mandates of the Internal Revenue Code, the SERP agreement requires that in the event of insolvency all SERP assets be available to pay the thrift's creditors. Specifically, the Umbrella trust directs the trustee to "hold the trust fund for the benefit of the general creditors of the Company" during any periods of insolvency. In accordance with this language, plan participants are explicitly classified as unsecured general creditors.[4]

Appellants, under the plain terms of the SERP and Umbrella

---

[4] At paragraph 10.1, the SERP agreement states:
<u>Unsecured General Creditor</u>. Benefits to be provided under this Plan are unfunded obligations of the Employer. Participants . . . shall have no legal or equitable rights, interests or claims in any property or assets of Employer, nor shall they be beneficiaries of, or have any rights, claims or interest in any life insurance policies, annuity contracts or the proceeds therefrom owned or which may be acquired by Employer . . . . Such policies or other assets of Employer shall not be held under any trust, except a grantor trust established by Employer . . . or be considered in any way as collateral security for the fulfilling of the obligations of Employer under this plan.

trust agreements, attained the legal status of unsecured general creditors at the time SASA, FA was placed into receivership. The preference status accorded appellants' rights stems from two sources in law: the Internal Revenue Code and the Texas Civil Statutes concerning savings and loans. As previously noted, the Internal Revenue Code permits grantor trusts only if trust beneficiaries are assigned the status of unsecured general creditors and only if trust assets remain available to the grantor's creditors in the event they are needed. It is clear that appellants intended to establish and participate in a grantor trust to receive this favorable tax status.

Additionally, applicable Texas law assigns priority to all claims against a failed thrift association. Under this statute, appellants' claims as unsecured general creditors are subordinate by law to all depositors' claims. Relying on this statutory language and the status of this trust as a grantor trust, the RTC classified appellants as unsecured general creditors for the purpose of liquidation priority.

Under the Texas Savings and Loan Act,[5] the claims of general

---

[5] The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") establishes and defines the statutory mandate of the RTC. The depositor preference section, 12 U.S.C. 1821(d)(11), which displaces state law to the extent of any inconsistency, was added by amendment August 10, 1993. The amendment, however, applies only "with respect to insured depository institutions for which a receiver is appointed after the date of the enactment of this Act [Aug. 10, 1993]." Act Aug. 10, 1993, P.L. 103-66, Title III § 3001(c) 107 Stat. 337. Because the institution we are concerned with on this appeal went into receivership in 1990, we look to state law to determine the relevant depositor preference for an insolvent institution.

creditors are assigned fourth priority, behind expenses of liquidation, secured creditor claims, and depositor claims.[6] As the receiver for the failed SASA, FA lacks adequate funds to fully compensate all depositors, appellants, under the plain terms of the SERP agreement, are not entitled to receive any funds in exchange for their certificates.

Appellants contend, however, that an oral contract existed, which explicitly mandated that their rights to payment under the SERP would be considered an expense of administration or liquidation. If this is the case, they now argue, their benefits are entitled to treatment as a first priority debt, one that should have been satisfied prior to the payment of any depositor claims. Alternatively, appellants assert rights in equity to payment of their benefits. Under each theory, appellants maintain that the transformative event asserted renders summary

---

[6] The Texas statute provides:
On liquidation of an association, claims for payment have the following priority:
(1) obligations incurred by the commissioner or the liquidating agent, fees and assessments due the Savings and Loan department, and expenses of liquidation, all of which may be covered by the proper reserve of funds;
(2) approved claims of creditors, to the extent that the claims are secured by, or constitute a lien on, the assets or property of the association;
(3) approved claims of depositors against the general liquidating account of the association;
(4) approved claims of general creditors and the unsecured portion of any creditor obligation described in Subdivision (2);
(5) otherwise approved claims that were not filed within the time prescribed by Section 66.305;
(6) approved claims of subordinated creditors; and
(7) claims of shareholders of the association.
Tex. Fin. Code Ann. § 66.306 (West 1998).

judgment inappropriate.  Each claim, and why it ultimately fails to override our understanding of the plain terms of the SERP agreement, is addressed below.

## B.  Oral Contract

It must be made clear that this is not a dispute about whether appellants are entitled to their benefits.  The RTC concedes that the SERP benefits at issue were fully vested and are in fact owed appellants as unsecured general creditors.  In fact, appellants received certificates representing their respective interests.  The critical dispute between the RTC and appellants in this matter concerns the determination of exactly what was bargained for in this case: the maintenance of the SERP and Umbrella trust agreements as they existed prior to conservatorship, or additional contract rights, bargained for to guarantee the receipt of SERP benefits in the event of insolvency.

Despite the clear terms of the Plan and governing statutes, appellants contend they entered into an oral employment contract with the Conservator and that this contract governs this dispute. Appellants assert that the critical term of this contract transformed their SERP benefits into an expense of administration.  In essence, appellants contend they were induced into staying on in their former positions at SASA and SASA, FA by this term.  In support of this claim, appellants assert they were continually promised they would receive their SERP benefits in full as service providers.

13

Our careful review of the record and all summary judgment evidence indicates otherwise. We find no evidence of any promise that appellants' SERP benefits would be paid in full. Rather, the unequivocal conclusion to be drawn from the deposition testimony and the documents submitted in support of appellants' claim is that they received exactly what they were promised: the maintenance of their benefits package as it existed prior to the financial difficulties experienced at San Antonio Savings.

To support their claim that an oral contract existed and governs these issues, appellants rely on their own declarations and little else. Appellants, in fact, fail to assert exactly when this oral contract arose or when the critical term was agreed upon. In fact, appellants seem to concede that the Conservator merely contracted for appellants' services in exchange for "payment of their salary and benefits, including their SERP benefits." There does not seem to be any dispute with respect to this duty, as the RTC readily conceded an obligation to pay these salaries and maintain these benefits packages.[7]

---

[7] An issue not explicitly discussed in any of the briefs is whether the parties may legitimately alter the status of the SERP plan by oral agreement. While the Plan agreement states that it may be amended by the Board at any time, the amendment provision makes no mention of the results should the Plan be modified such that it no longer accords with the Internal Revenue Code. If the Plan was modified as appellants assert, then the Plan would no longer comply with the strict requirements of the Code. It seems unlikely that the parties could legitimately orally contract to form a grantor trust with first priority in the event of insolvent distribution, as the Code requires grantor trust beneficiaries to be classified as unsecured general creditors and Texas law requires that general creditors receive fourth priority in the event of distribution. However, as we find no evidence of

14

By all appearances, appellants, in claiming a contract right to their benefits, conflate a promise that they would receive their benefits in full with a promise that they would actually receive a money payment from the Plan in the event of insolvency. As previously noted, there is nothing in the Plan's language or in the statutes governing this type of trust that guarantees distribution of the trust's assets to the beneficiaries.  Mere assertion of a belief that the plan was somehow transformed, and that this transformation would lead to payment subsequent to the unfortunate event of insolvency, is not enough to defeat summary judgment.

Appellants further maintain that an oral contract representing the transformation of their legal status of employment is evidenced on these facts by the behavior of the Conservator.  Specifically, appellants repeatedly assert that during the conservatorship they were classified as service providers and that their salaries and benefits constitute expenses of administration.   As expenses of administration, appellants maintain that their SERP benefits should have received first priority at the time of liquidation.

Appellants, however, fail to marshal evidence to support their conclusory statements.  Appellants repeatedly draw our attention to the adoption of the SERP plan by SASA, FA.  They assert that this manifests an intent to pay Plan benefits in

---

an oral contract in the first instance, it is unnecessary to resolve this thorny issue.

15

full.  While it is true that the Conservator took steps to transfer the SERP agreement to SASA, FA, this evidence better supports the RTC's reading that Plan adoption represented an effort to maintain the benefit programs as they existed prior to conservatorship, as well as an effort to preserve the Plan's funds for all the thrift's creditors.  Standing alone, the transfer of the SERP plan to SASA, FA is not enough to defeat summary judgment.

Aside from relying on SASA, FA's adoption of the SERP, appellants draw upon a small number of conversations and the circumstances of their ongoing employment to claim that their SERP benefits should be paid in full as expenses of administration.  The RTC maintains that a promise to characterize SERP benefits as expenses of liquidation could not have been made in the first instance, as a conservator, by definition, does not incur any expenses of liquidation.[8]  As appellants rely on the circumstances of their ongoing employment to contest summary judgment, it is necessary to examine these competing conclusions.

In essence, the RTC asserts that appellants have confused the legal functions of a conservator with those of a receiver.

_____

[8]  Under 12 U.S.C. § 1821(d)(2)(D), the RTC as conservator is empowered to "take such action as may be (i) necessary to put the insured depository institution in a sound and solvent condition; and (ii) appropriate to carry on the business of the institution and preserve and conserve the assets and property of the institution."  The RTC as receiver, under 12 U.S.C. § 1821 (d)(2)(E), is empowered to "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution, having due regard to the conditions of credit in the locality."

16

Receivers and only receivers incur expenses of liquidation, as only receivers have the power to liquidate a failed thrift. We are persuaded by this reading of the relevant statute.[9] Conservators may incur expenses of administration, through the course of administering the conservatorship. However, these expenses are not relevant to our resolution of this case, as it is the receiver who failed to pay under the terms of the SERP.

Critically, appellants were never employed by the receivership at issue in this case. As described in the facts, appellants were employed by the SASA and the SASA, FA conservatorships, but all employment relationships ceased in March 1990, when the RTC was appointed receiver for SASA, FA.[10] As such, they never assisted with the liquidation process and their salaries and benefits cannot correctly be classified as expenses of liquidation.

Appellants maintain that 12 U.S.C. § 1821(e)(7) governs and mandates the conclusion that service providers are to be paid as

---

[9] The statute at issue is 12 U.S.C. § 1821(d), Powers and duties of Corporation as Conservator or Receiver. In the interest of brevity, the full text is not quoted here.

[10] Appellants emphasize the fact that McAllister, who served as Chairman of the Board of San Antonio Federal Savings Bank, a banking subsidiary of SASA and later SASA, FA, maintained his position as Chairman after SASA, FA entered receivership. He apparently was not compensated for his work in this position, and in fact apparently incurred personal financial losses canvassing the country in search of an investment group to acquire SAFSB. McAllister's actions taken in this position, however, are irrelevant to his claim for SERP benefits, as his participation in the SERP plan was independent of his duties as Chairman of SAFSB.

expenses of administration.[11]  In their reading of the relevant statute, however, appellants fail to acknowledge 12 U.S.C. §1821 (d)(2)(D), which states explicitly that a conservator only has the power to take actions necessary to restore a financially troubled institution to solvency.  Expenses of liquidation cannot be incurred by a conservator as a matter of law, as liquidation is not a function of the conservator.  See RTC v. United Trust Fund, Inc., 57 F.3d 1025, 1033 (11th Cir. 1995) ("The

---

[11]  The text of the statute reads:
(7) Provisions applicable to service contracts
        (A) Services performed before appointment
        In the case of any contract for services between any person and any insured depository institution for whish the Corporation has been appointed conservator or receiver, any claim of such person for services performed before the appointment of the conservator or the receiver shall be—
                (i) a claim to be paid in accordance with subsections (d) of this section; and
                (ii) deemed to have arisen as of the date the conservator receiver was appointed.
        (B) Services performed after appointment and prior to repudiation
        If, in the case of any contract for services described In subparagraph (A), the conservator or receiver accepts performance by the other person before the conservator or receiver makes any determination to exercise the right of repudiation or such contract under this section—
                (i) the other party shall be paid under the terms of the contract for the services performed; and
                (ii) the amount of such payment shall be treated as an administrative expense of the conservatorship or receivership.
        (C) Acceptance of performance no bar to subsequent repudiation
        The acceptance by an conservator or receiver of services referred to in subparagraph (B) in connection with a contract described in such subparagraph shall not affect the right of the conservator or receiver to repudiate such contract under this section at any time after such performance.

18

conservator's mission is to conserve assets which often involves continuing an ongoing business.  The receiver's mission is to shut down and sell off its assets.").

The RTC is correct in noting that a receiver is obliged to pay for services as administrative expenses under 12 U.S.C. § 1821(e)(7) only where the receiver has actually accepted performance of services subsequent to appointment, but prior to the repudiation of any existing service contracts.  This is a question of timing.  Section 1821(e)(7) requires both conservators and receivers to make full payment under existing service contracts, and to treat those obligations as expenses of administration.  However, the two entities - conservatorships and receiverships - are separate, with separate obligations, and separate expenses of administration.  Only the expenses incurred by a receiver constitute expenses of liquidation.  As appellants never performed any services for the Receiver, they are not entitled to any preferential treatment for the services they performed for the Conservator.  These provisions function to guarantee payment under existing service contracts to those individuals who perform services for a failed, and liquidating, institution.  Here, only the Conservator accepted the executives' services, and in so doing adopted, not repudiated, their pre-existing terms of employment.  Pursuant to this adoption, appellants received their salaries, and all benefit packages were maintained intact.  When the proper claims were made to the receiver, certificates were issued in the full amounts due.

Our reading of the relevant law and our interpretation of the legal consequences that flow from the formation of the SERP agreement as a grantor trust conform with the reading of other courts to have considered the issue. The leading cases concerning grantor trusts in bank liquidations all hold that the trust funds are available to general creditors and depositors of the bank; all find the language of the trusts to be decisive; and, none treat grantor trusts as expenses of liquidation. See Westport Bank & Trust Co. v. Geraghty, 90 F.3d 661, 669 (2d Cir. 1996) ("By virtue of this beneficial tax treatment, . . . 'the recipient receives only the company's unsecured promise to pay benefits and has no rights against any assets other than the rights of a general unsecured creditor of the company.'" (citations omitted)); RTC v. MacKenzie, 60 F.3d 972, 978 (2d Cir. 1995) ("The fact that the Plan assets remained in the trust corpus, thus in the possession of [the institution], at the time RTC was appointed Receiver alone compels our holding that RTC has a superior right to the Plan assets at this time."); Goodman v. RTC, 7 F.3d 1123, 1129-30 (4th Cir. 1993) ("Appellants are really asking for a preference over other creditors; unfortunately, the recipients of grantor or "rabbi" trusts are unsecured creditors, who took the risks of being subject to the claims of general creditors for the benefits of favorable tax treatment-a gamble which failed to pay off in this case.").

Furthermore, the relevant statutes make clear that the receiver, not the conservator, "has the authority to liquidate

20

the assets and pay the obligations of the insured institution on behalf of the depositors and creditors." RTC v. Cheshire Management Co., 18 F.3d 330, 333 (6th Cir. 1994). See also RTC v. Cedarminn Bldg. Ltd Partnership, 956 F.2d 1446 (8th Cir. 1992). Pursuant to this authority, "[t]he RTC receiver liquidates an institution and distributes its proceeds to creditors according to the priority rules set out in regulations." Del E. Webb McQueen Dev. Corp. v. RTC, 69 F.3d 355 (9th Cir. 1995).

It is inconceivable under the relevant law that the Conservator in this case could have contracted with appellants to transform their SERP benefits into expenses of liquidation. The Conservator contracted for assistance with the administration of the conservatorship - and it promptly and fully compensated appellants for their work in this regard according to the terms of the previously existing service contract. It was not in the power of the Conservator to transform these benefits into expenses of liquidation incurred by the receiver in this case. As there is no evidence that language to this effect was ever used by the Conservator, there is no evidence that the Conservator intended to do so or intended to mislead appellants that it in fact had been done.

Appellants, in a final attempt to persuade us their claims deserve treatment as expenses of liquidation, analogize the facts of their case to the law of bankruptcy. We are not convinced. Not only is bankruptcy law inapplicable to this matter, relevant

Bankruptcy Code definitions lead to the same conclusion reached above: expenses of liquidation include only those "wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). The services at issue here were not rendered after the start of the analogous case. Further, appellants would have to persuade us that SERP benefits of the type at issue here are properly considered wages, salaries or commissions. As we need not explicitly make a finding on this issue to resolve the case before us, we decline to do so. However, we do note that appellants' brief and argument standing alone are unpersuasive in this regard. They cite to no case law or governing statutes that require such a finding. The lone affidavit submitted in support of this loose analogy is not enough to defeat summary judgment.

Appellants have failed to demonstrate the existence of an oral contract, relevant to the distribution status properly accorded their SERP benefits. Appellants have further failed to convince us that these benefits properly deserved treatment as expenses of administration. Summary judgment, based on the plain terms of the SERP agreement and underlying trust, was proper with respect to each of these arguments.

## C.  Estoppel and Law of the Case

Appellants final argument rests in equity. As noted at the outset, this is not the first time this dispute has reached this Court. In McAllister v. FDIC, 87 F3d 762 (5th Cir 1996), this Court held that the FDIC was equitably estopped from asserting a

limitations defense, because representations made to appellants concerning the status of their claims led them to delay filing suit against the RTC.[12]  This Court reasoned that as certain assurances offered by the RTC induced Appellants into waiting to file suit, the statute of limitations was equitably tolled, and the case was properly filed.

Appellants now assert that this holding disposes of the present issue.  Specifically, Appellants maintain that as this Court already found evidence of oral misrepresentations, this panel may not now reexamine this issue.  This is a clear misreading of not only the previous holding, but of our duty under the doctrine of the law of the case.  While we remain ever mindful of our obligation to adhere to previous findings of this Court, we refuse the invitation to contort our prior holding to reach appellants' view of this matter.

Our prior holding, in essence, settled a jurisdictional matter: whether the suit was timely filed.  By finding that appellants delayed filing due to representations concerning their claims, this Court said nothing about the merits of the claims themselves.   While it is true that this Court did find that representations were made by the RTC that appellants would be

---

[12]  Typically, the RTC responds to claims against it within 180 days.  The claiming party then has 60 days to file suit against the RTC in the event of a negative disposition.  Appellants failed to meet this 60 day deadline and the RTC asserted this failure as a bar to this litigation.  This Court held that the 180/60 day time period was equitably tolled, as the RTC orally informed Appellants that their claims would be allowed.

23

paid in full, those representations are distinct from any oral contract appellants now assert may have been formed from the outset. In short, while "the RTC's false assertions that the plaintiffs would be paid in full induced them *not to file suit* within the 60 day period following the issuance of the Receiver's Certificates," those false assertions by no means dispose of the issue concerning the proper status afforded to those claims in the first instance. McAllister, 87 F.3d at 767 (emphasis added). The doctrine of the law of the case does not resolve the issues here.

In so holding, we fully acknowledge the language of our prior opinion, quoted above, which clearly found false assertions attributable to the RTC. However, timing is crucial. The assertions found to be misleading by this Court were made after the total collapse of the SASA, FA conservatorship. The assertions found to be false related only to whether the claims would be paid, after the employment relationship ceased to exist. Appellants cannot now claim that they were induced into working for the SASA and SASA, FA conservatorship by promises made subsequent to the termination of this employment relationship. Concerning representations made prior to the end of the SASA, FA conservatorship, our previous opinion offers no insight.

In fact, our previous opinion reiterates the language of the SERP agreement, to conclude that "trust assets could also be used to pay creditors if the bank became insolvent" Id. at 763. Further, and most critically, our previous opinion indicates that

the assurances made by the RTC concerning who would be paid in full, which later turned out to be false, related mainly to miscalculations on the part of RTC employees concerning the amount of funds available to pay all creditors of the bank.  We are not now bound by the conclusion that false assertions were made, subsequent to the end of the employment relationship, concerning whether there would be enough funds left to pay appellants as unsecured general creditors.

## IV.    Conclusion

We note in closing that appellants were issued certificates for the full value of their SERP benefits.  Those certificates entitle the executives to exactly what they bargained for – payment of their SERP benefits if and when the failed thrift's liquidated assets exceed the aggregate value of the claims of the thrift's depositors and secured creditors.  Because we find no genuine issues of material fact concerning the legal status properly accorded appellants' rights to obtain payment under the SERP plan, we AFFIRM the district court's grant of summary judgment, based on the plain language of the SERP and Umbrella trust agreements, and the applicable Texas state depositor preference law.

The judgment of the district court is AFFIRMED.