**John S. PEREIRA, as Trustee of Trace International Holdings, Inc. and Trace Foam Sub, Inc., Plaintiff,**

v.

**Marshall S. COGAN, Saul S. Sherman, Andrea Farace, Frederick Marcus, Robert H. Nelson, Philip Smith, Karl Winters, Tambra King Defendants.**

**No. 00 CIV.619 (RWS).**

United States District Court,
S.D. New York.

May 8, 2002.

---

369

LeBoeuf, Lamb, Greene, & MacRae, L.L.P., New York, By John P. Campo, Esq., Theodore J. Fischkin, Esq., Alison J. Chen, Esq., Of Counsel, for Plaintiff.

Salomon Green & Ostrow, P.C., Attorneys for Defendant Marshall S. Cogan, New York, By Chester B. Salomon, Esq., Alec P. Ostrow, Esq., Nicholas F. Kajon, Esq., Walter Benzija, Esq., Of Counsel, Morvillo, Abramowitz, Grand, Iason & Silberberg, Attorneys for Defendant Marshall S. Cogan, New York, By Michael C. Silberberg, Esq., Elkan Abramowitz, Esq., Of Counsel, Swidler, Berlin, Shereff, Friedman, Attorneys for Defendant Saul S. Sherman, New York, By Shalom Jacob, Esq., Of Counsel, Piper Marbury Rudnick & Wolfe, LLP, Attorneys for Defendants Robert H. Nelson, Philip Smith, Karl Winters, and Tambra King, New York, By Robert A. Meister, Esq., Of Counsel, for Defendants.

## OPINION

SWEET, District Judge.

Plaintiff John S. Pereira as Trustee (the "Trustee") of Trace International Holdings, Inc. and Trace Foam Sub, Inc. (collectively "Trace") has moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 against defendant Marshall S. Cogan ("Cogan"), seeking to dismiss $14.7 million in alleged Cogan offsets [1] in the form of additional employment compensation or excess benefits claims.

For the following reasons, that motion is granted in part and denied in part.

1. Cogan designates these offsets as affirmative defenses rather than counterclaims because Cogan does not seek any recovery from the bankruptcy estate and thereby seeks to preserve his rights to a trial before a court exercising the judicial power of the United States and a jury, under Article III of and the Seventh Amendment to the United States Constitution. The offsets are intended solely to bar or abate any recovery by the bankruptcy estate.

## PARTIES

Trace International is a Delaware corporation. It and its subsidiary, Trace Foam, filed petitions under Chapter 11 of the Bankruptcy Code on July 21, 1999. The cases were converted into proceedings under Chapter 7 on January 24, 2000. The Trustee was appointed on January 25, 2000.

Cogan was the majority common stockholder of Trace International as well as its chief executive officer ("CEO") and chairman of its board of directors. Cogan was terminated when Trace's bankruptcy case was converted into proceedings under Chapter 7, on January 24, 2000.

## PRIOR PROCEEDINGS

On April 23, 2001, the Trustee filed a motion for partial summary judgment seeking to hold Cogan liable on eight separate promissory notes in the amount of about $14.3 million and sought to dismiss two affirmative defenses asserting unrelated offset claims against the notes. That motion was granted. *Pereira v. Cogan*, 267 B.R. 500, 503 (S.D.N.Y.2001).

The Court dismissed one offset seeking $3.6 million in severance and $1.1 million in compensation under the renewal in 1997 of the 1987 Agreement. It was held that the 1997 renewal was "void as a self-dealing transaction which cannot be justified under Delaware law." *Pereira*, 267 B.R. at 509.

The Court also dismissed $12 million in alleged offsets arising under agreements that pre-date the 1987 Agreement. The 1987 Agreement contained a broad merger clause, providing that "[a]ny and all" prior agreements between the parties "relating to the subject matter hereof . . . are mutually terminated and cancelled." At issue was a 1985 Agreement concerning severance, retirement and death benefits. It was held that these comprised the "same subject matter" of the 1987 Agreement and thus were superseded by the later agreement and its broad merger clause. *Id.* at 514–16.

The instant motion was filed on February 1, 2002 and was considered fully submitted on March 6, 2002.

## FACTS

The parties and events discussed herein are described in greater detail in previous opinions, including *Pereira v. Cogan*, No. 00 Civ. 619, 2001 WL 243537 (S.D.N.Y. March 8, 2001) and *Pereira v. Cogan*, 267 B.R. 500 (S.D.N.Y.2001), familiarity with which is presumed.

The following facts are taken from the parties' Rule 56.1 statements and, as required, are construed in the light most favorable to the non-movant, as applicable.

## I. CONTRACTUAL CLAIMS

### A. *1980 Agreement—Alleged $1 Million Offset*

On or about January 8, 1980, Cogan and GFI entered into an Executive Deferred Benefit Agreement, as amended in March 1985, under which GFI/Trace was obligated to pay to Cogan a benefit of $1 million (the "1980 Agreement"). Cogan has not produced a signed copy of this agreement.

The Trustee claims that an earlier ruling precludes this claim. As discussed above, it was held that Cogan's subsequent 1987 Agreement expressly canceled and superseded all prior agreements between the parties relating to the same "subject matter." Retirement benefits were a "subject matter" of the 1987 Agreement. The Trustee claims that the $1 million benefit Cogan claims is a retirement benefit.

Article 2.1 of the 1980 Agreement states that "[t]he benefit payable by the Company to [Cogan] upon [Cogan]'s attaining the age of 65 shall be One Million

Dollars ($1,000,000) payable in one hundred twenty (120) equal monthly installments." 1980 Agreement at 3. Article 2.3 of the Agreement refers to the benefit as a "retirement benefit." *Id.* ("2.3 Upon the termination of employment with the Company of [Cogan] prior to his attainment of age 65 ... the first monthly installment of the *retirement benefit* shall be payable to [Cogan] on the first month next following his date of retirement, if he is then living."). Further, the first WHEREAS clause in a March 1985 amendment to the agreement states that "that parties entered into [the 1980 Agreement] providing certain retirement and death benefits to [Cogan]." 1985 Amendment, at 1.

Cogan contends that it was neither Trace's nor his intent for the 1987 Agreement to eliminate benefits provided for Cogan under the 1987 Agreement. Further, Rocco Barbieri ("Barbieri") received a severance package that was identical to the Executive Deferred Benefit Program Agreement but for the amount paid. There is no evidence as to whether Barbieri also signed an agreement such as the 1987 Agreement containing a broad merger clause.

### B. *Top Hat Benefits—Alleged $8.774 Million Offset*

[redacted] Cogan claims he is entitled to receive up to $8.744 million from a top hat account established by Trace in his name.[2] A top hat plan is an unfunded excess benefits plan, above IRS limits for qualified plans, for specifically named executives. *See also Demery v. Extebank Deferred Compensation Plan (B),* 216 F.3d 283, 286–87 (2d Cir.2000) (defining top hat plan and listing ERISA exemptions).

Cogan claims his right to this account was established in the GFI Plan, the 1987 Agreement, and by oral agreement.

#### 1. *The GFI Plan*

The benefits were originally included as § 5.7 of the 1985 General Felt Industries Retirement Plan ("GFI Plan"), which concerned "Supplemental Benefits." GFI is the former name of Trace.

The Trustee claims that the benefits were eliminated pursuant to § 11.1. That section reserved the power to change any Plan provisions, with the only exception being for rights which vested, prior to any such change, "by retirement, termination [of employment] or death." The GFI Plan was merged into Trace's current pension plan, and § 5.7 was eliminated no later than 1994. At that point, Cogan had not retired, died or terminated his employment with Trace.

Cogan claims, however, that Trace never intended to eliminate Cogan's right to excess benefits following the merger of the GFI plan with Trace's current pension plan and that the benefits of § 5.7 were preserved pursuant to § 12.4 of the GFI plan. That section states:

> In the case of any merger or consolidation with, or transfer of assets or liabilities to, any other plan after September 2, 1974, each Participant in the Plan would (if the Plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger consolidation, or transfer (if the Plan had then terminated).

2. On April 29, 1999, Trace International's independent actuaries, a division of Price Waterhouse Coopers ("PWC") sent a letter to Trace International's Assistant Controller. In that letter, PWC referred to an accrued benefit for Cogan of $8.744 million, as of December 31, 1998, under a top hat plan.

GFI Plan, § 12.4. Under this theory, Cogan claims he is entitled to benefits that had accrued up to the 1994 merger.

### 2. *The 1987 Agreement*

It is undisputed that ¶ 11 of Cogan's 1987 Employment Agreement (the "1987 Agreement") contained a top hat provision and that Cogan did not qualify under its terms.[3]

Cogan contends, however, that he could receive the benefits under ¶ 17(a)(iv) of the 1987 Agreement. That paragraph concerns termination payments "[i]n the event of a termination by Mr. Cogan with Good Reason or by the Corporation other than for cause." Within five business days of the termination, the corporation was required to pay Cogan "a lump sum payment ... equal to the present value ... of the additional accrued benefits Mr. Cogan would have had on the termination of the Initial Term of the Renewal Term, as the case may be, under all of the Corporation's, its subsidiaries' or divisions' Employee Benefit Plans calculated on the basis of the highest annual compensation paid hereunder to Mr. Cogan in any year, disregarding any limitation imposed by law on an amount payable by qualified pension plan." 1987 Agreement, ¶ 17. The last phrase echoes that of ¶ 11, which the parties agree contains top hat benefits language.

Recognizing the previous holding that the 1987 Agreement was not renewed in 1997, Cogan argues under this theory that he is entitled to the amount of benefits that had accrued as of 1997, or approximately $7 million.

### 3. *Oral Agreement*

Cogan also contends that he and Trace had an oral agreement for Trace to pay Cogan excess or top hat benefits and that this agreement would continue for the duration of his employment. He offers the following as evidence of the agreement.

For each of the tax years 1994 through 1997, Trace filled out Schedule L of Form 1120 which is the taxpayer's balance sheet per books. In a statement required to be submitted with each tax return, Trace reported to the Internal Revenue Service its liabilities for top hat benefits for Cogan and another executive in precisely the same aggregate amount as set forth each year by Trace's actuaries and recorded in Trace's books. These tax forms were signed and subscribed by Trace and filed with the Internal Revenue Service.

In his deposition testimony, Ronald Mamary, Trace's Assistant Controller ("Mamary")[4] testified that he annually requested from Martin Collins of Kwasha Lipton, Trace's actuary ("Collins"), an actuarial letter setting forth the excess benefits

---

3. Cogan could receive the benefits if he elected to terminate his employment by reason of retirement on any anniversary date of the agreement (August 5), provide written notice that he was terminating the Agreement for that reason, and elect to receive top hat benefits in lieu of the termination benefits described in ¶ 17. 1987 Agreement ¶ 11. Cogan was CEO of Trace until "early 2000" rather than August 5 of any year. There is no evidence that he provided written notice that he was terminating the 1987 Agreement for reason of retirement and electing to collect top hat benefits in lieu of termination pay.

4. Cogan claims that Mamary's deposition testimony should be considered an admission because Mamary was the Trustee's agent and his testimony was directly related to the scope of his duties as the Trustee's employee. At the time, Mamary's engagement by the Trustee was limited to "Working with him on the fine art, ... trying to account for the artwork." An agent employed to account for artwork does not speak for his principal about excess benefit liabilities. The limited nature of Mamary's engagement suggests that Mamary had no authority to speak for the Trustee at the time of the deposition.

owed to Cogan and another executive for the purpose of recording the liability on the books and records of Trace and to satisfy auditing requirements. Mamary further testified that he would record the figures contained in the annual letters from Collins on Trace's books as liabilities owed by Trace. Mamary testified that Trace maintained an excess benefit plan in 1995, 1996, 1997, and 1998.

Mr. Wood, Trace's Benefits Manager ("Wood"), states that Trace did not intend at any time to eliminate Cogan's entitlement to excess benefits.

## II. *EMPLOYMENT POLICY CLAIMS*

### A. *Severance Policy—Alleged $3.6 Million Offset*

Cogan first claims that "the Court's invalidation of the renewal of the 1987 Agreement as of August 5, 1997 resulted in the continuation of the original terms of Mr. Cogan's employment except on an at-will basis from August 5, 1997 to early 2000." Therefore, he argues, he had "the same entitlement to severance pay that would have otherwise been afforded him under the 1987 Agreement."

Cogan also contends that Trace had a regular severance policy in place for senior executives that he relied on and thus he is entitled under it to one-year's severance of $3.6 million. That is the same amount Cogan seeks as contractual severance under his invalidated 1987 Agreement.

From August 5, 1997 until 2001, neither Trace nor Cogan knew that the 1987 Agreement had not in fact been renewed and therefore did not know the written severance was void during that time. Moreover, Cogan explicitly stated that he relied on the written agreement. Cogan contends, however, the he relied on the unwritten policy in negotiating the terms of the written agreement.

Cogan offers the following as evidence of a regular practice of granting severance to senior executives. Robert H. Nelson, Trace's chief financial officer from February 1987 until January 2000 and one of the defendants herein, affirmed that all Trace senior executives were entitled to a severance payment of at least one year's salary and "sometimes more." Cogan also affirms that from its inception in 1974, Trace had an informal but consistent practice of paying its executives severance. In addition, Cogan offers as evidence of this practice two grants of severance to senior executives. Both of these severances were granted pursuant to individually negotiated agreements that were different both from each other and from the severance relief Cogan seeks. Both agreements contained a release of claims against Trace.

### B. *Vacation Policy*

Cogan has withdrawn his offset for vacation pay.

## III. *NOVATION—ALLEGED $1.1 MILLION OFFSET*

Cogan seeks to claim a $1.1 million offset for allegedly underpaid 1999 contractual compensation. During 1999, the contractual amount of Cogan's services under the voided renewal agreement was $3.6 million, plus certain perquisites and expenses. During 1999, Cogan claims that he fully performed his obligations under the agreement but agreed to defer payment of approximately $1.1 million of the compensation he earned under the agreement. Trace International has failed to pay the deferred compensation to Cogan.

From and after August 5, 1997, Cogan and Trace continued to act as if the 1987 Agreement were still in effect, with Cogan holding the same titles, performing the

same functions, bearing the same responsibilities, drawing the same compensation and enjoying the same perquisites as before August 5, 1997. Cogan claims that Trace intended to continue to provide Cogan with the same salary and benefits he was entitled to receive on August 5, 1997.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD OF REVIEW

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002).

### II. COGAN'S CONTRACTUAL CLAIMS

#### A. 1980 Agreement—Alleged $1 Million Offset

█ The Trustee contends that Cogan is not entitled to the $1 million benefit because the 1980 Agreement was super-

seded by the broad merger clause in the 1987 Agreement. The clause states that the Agreement supersedes all agreements between the parties relating to the same "subject matter." Further, it was held that retirement benefits were a "subject matter" of the 1987 Agreement. *Pereira,* 267 B.R. at 514.

First, Cogan argues that there is a triable issue of fact as to whether the 1980 Agreement involves the provision of retirement benefits to him. It is true that Article 2.1 of the 1980 Agreement does not mention retirement and appears to premise the $1 million on Cogan's reaching the age of 65, rather than on his retirement *per se.* 1980 Agreement at 3. However, Article 2.3 of the agreement does refer to the benefit as a "retirement benefit." *Id.* Further, the first WHEREAS clause in a March 1985 amendment to the agreement states that "that parties entered into [the 1980 Agreement] providing certain retirement and death benefits to [Cogan]." 1985 Amendment, at 1.

Cogan argues that the use of the word "retirement" to modify the word benefits "was not meant to characterize the true nature of the benefit." Def.'s Mem. at 5 n. 1. Yet Cogan fails to explain why the adjective "retirement" was used if it were not meant to characterize the nature of the benefit. If Cogan alleges it was a mistake, he offers no proof to back up this allegation. Given the reference in a 1985 amendment to the 1980 Agreement as one providing "retirement benefits" it hardly seems likely. Because Cogan has not presented a triable issue of fact with regard to whether the 1980 Agreement concerns the subject matter of retirement, the $1 million provision is superseded by the 1987 Agreement.

Cogan's argument regarding the "Employee Benefits" provision of ¶ 2 of the

1987 Agreement is also unavailing. That provision provides that Cogan:

> shall be eligible to participate, fully and on a reasonable basis comparable to other executive officers, in ... all individual or group insurance, retirement, disability, salary continuation and other employee benefit plans, programs, or arrangements or any equivalent successor plans, programs or arrangements that may now exist ... (such benefits being referred to collectively as "Employee Benefits" and such plans, programs and arrangements being referred to collectively as "Employee Benefit Plans") *provided, however*, that Mr. Cogan's rights thereunder shall be governed by the terms thereof and shall not be enlarged hereunder or otherwise affected hereby.

1987 Agreement, ¶ 2. It was held that this provision "merely preserves Cogan's right to participate 'on a reasonable basis comparable to other executive officers' in various benefit programs, and has nothing to do with the special contractual agreement for Cogan under the 1985 Agreement." *Pereira*, 267 B.R. at 514.

To distinguish this ruling, Cogan argues that "the holding assumes ... that the 1985 Agreement was unique to Mr. Cogan and that agreements on similar terms were not given to other Trace executives." Def.'s Mem. at 6. Further, he argues that agreements on similar terms as the 1980 Agreement were given to other executives. As evidence of this he presents (1) his testimony that it was Trace's practice to set down benefit programs in separate contracts with its executives; and (2) an allegedly similar agreement entered by another executive, Rocco Barbieri, in January of 1980. Cogan's conclusory testimony, in the absence of support from the record, is insufficient to present a material issue of fact. The Barbieri contract also does not support his claim as there is no evidence that Barbieri entered into a subsequent agreement with a comparable merger clause to that in the 1987 Agreement.

Summary judgment is appropriate here because the 1980 Agreement does not admit of any other meaning than that it involved retirement benefits and was a specific contract individual to Cogan. *John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 461–63 (2d Cir.1994) (granting summary judgment where contract "conveys a definite meaning" and nonmoving party "would contradict the language of the contract"). Therefore, it is superseded by the 1987 Agreement. This offset is dismissed.

### B. *Top Hat Benefits—Alleged $8.77 Million Offset*

 The Trustee claims that Cogan has no contractual right[5] to the top hat benefits. Cogan claims, however, that he is entitled to the benefits under the GFI Plan, under ¶ 17 of the 1987 Agreement, or under an oral contract.

### 1. *GFI Plan*

The Trustee claims that when the GFI Plan was merged in 1994 into Trace's current pension plan, § 5.7, the provision providing top hat benefits to Cogan, was eliminated. The GFI Plan expressly reserved the right to make pre-retirement changes, and Section 5.7 was eliminated at least by 1994. The Second Circuit addressed a

---

5. Rights under a top hat plan are governed by contract law as opposed to trust or fiduciary principles under ERISA. *Gallione v. Flaherty*, 70 F.3d 724, 728–29 (2d Cir.1995); *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 436, 442–43 (3d Cir.2001). The Second Circuit has left open the question of whether ERISA also preempts top hat contract claims. *Gallione*, 70 F.3d at 728–29.

similar situation in *Gallione v. Flaherty*, 70 F.3d 724, 728–29 (2d Cir.1995). There, the Court dismissed a top hat claim because the clause in question had been eliminated prior to the claimant's retirement. The pre-retirement change was effective because the plan contained no provision "stating that [a participant's] rights would accrue or be vested at any time before his retirement. Nor was there a provision stating that the plan could not be eliminated at any time." *Id.* at 729; *see also Connors v. Howard Stores Corp.*, 23 A.D.2d 686, 257 N.Y.S.2d 608, 609 (2d Dep't 1965) (holding that exercise of "reserved power to amend" prior to plaintiff's retirement, was effective to eliminate nonvested benefit).

Cogan, however, points to another portion of the GFI Plan that he claims would preserve the rights up until the time of merger and thus avoid the *Gallione* result. Section 12.4 of the GFI Plan provides:

> In the case of any merger or consolidation with, or transfer of assets or liabilities to, any other plan after September 2, 1974, each Participant in the Plan would (if the Plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, the consolidation, or transfer (if the Plan had then terminated).

GFI Plan, § 12.4.[6] Therefore, Cogan claims that he should receive the top hat benefits at least in the amount at the time of the 1994 merger.

Section 12.4 cannot be read in a vacuum, however. It is necessary to refer back to the original provision establishing the right to supplemental benefits. Section 5.7 provides that "In the event that the Plan shall be terminated in accordance with Section 12, no part of the Trust Fund shall be used to provide supplemental benefits and supplemental benefit payments shall thereupon cease, unless the Company shall otherwise specifically provide by action of its Board of Directors at the time of termination of the Plan." GFI Plan, § 5.7. To determine benefits under § 12.4, one must look to what would occur if the GFI Plan had been terminated instead of merged. Under § 5.7, if the GFI Plan had been terminated, Cogan would have received nothing in the absence of board approval. There is no evidence of any such board approval, and Cogan therefore cannot rely on this contractual provision.

In the absence of any contractual provision entitling Cogan to the top hat benefits under the GFI Plan, the testimony of Cogan, Wood, and Mamary to the general intent of Trace to maintain the benefits from the GFI Plan is unavailing as expressly contradicted by the contract.

### 2. *1987 Agreement*

It is undisputed that Cogan is ineligible to receive the top hat benefits under ¶ 11 of the 1987 Agreement. Because Cogan cannot rely on ¶ 11, he instead looks to ¶ 17(a)(iv) for his right to top hat benefits.

Paragraph 17 only applies "[i]n the event of a termination by Mr. Cogan with Good Reason or by the Corporation other than for Cause ...." Cogan was not ter-

---

**6.** This language mirrors that of § 1058 of the Employment Retirement Income Security Act ("ERISA"), which protects participants in ERISA qualified plans from a diminishment or termination of benefits on account of a merger, consolidation, or transfer of the original pension plan. As the Trustee points out, however, that ERISA section is part of the statute's "participation and vesting" provisions, 29 U.S.C. §§ 1051–61, from which top hat plans are specifically exempt. 29 U.S.C. § 1052(2); *Gallione*, 70 F.3d at 728. Therefore, a provision that mirrors the statue would similarly be irrelevant to top hat plans.

minated until January 2000. In January 2000, the 1987 Agreement was not in effect, since the 1997 renewal of the 1987 Agreement in August 1997 was void as unlawful self-dealing. *Pereira*, 267 B.R. at 510.

■ Cogan responds that while he cannot obtain the accrual of any benefits after August 1997, he can obtain the balance at the time of the void renewal, which amounts to about $7 million. This argument ignores the fact that the triggering event of termination did not occur in August 1997. In any case, when a self-dealing contract is declared void, the offending party has no remedy for breach. *Wachsler, Inc. v. Florafax Int'l Inc.*, 778 F.2d 547, 553 (10th Cir.1985) (applying Delaware law).

■ To the extent that Cogan argues that Section 17 of the Agreement somehow should be found severable from the portions of the renewal of the 1987 Agreement found offensive, that claim also fails. Severability can only be invoked "by a party who did not engage in serious misconduct." Restatement (Second) Contracts, § 183; II *Farnsworth on Contracts* § 5.8 at 70; *see also Technical Aid Corp. v. Allen*, 134 N.H. 1, 591 A.2d 262, 271 (N.H.1991) ("Enforceable terms of a contract may be given effect if the unenforceable terms are not essential to the agreed exchange, and if the party seeking enforcement has not engaged in serious misconduct."). The Delaware courts have long condemned self-dealing by corporate insiders as serious misconduct. *Bovay v. H.M. Byllesby & Co.*, 27 Del.Ch. 381, 38 A.2d 808, 820 (1944) ("a court of conscience will not regard such acts as mere torts but as serious breaches of trust ...."); *Sealy Mattress of New Jersey, Inc. v. Sealy Inc.*, 532 A.2d 1324, 1341 (Del.Ch.1987) ("egregious" misconduct); *HMG/Courtland Props. Inc. v.*

*Gray*, 749 A.2d 94, 123 (Del.Ch.1999) (same).

In any case, this Court directly addressed the provisions of § 17 and found that the heavy termination penalties merited avoidance of the 1997 renewal. "Once the 1997–2007 Renewal Term began, the Agreement severely penalized Trace in the event of early termination or other diminution of Cogan's privileges, irrespective of whether such actions were justified. For example, if the Board terminated Cogan *for cause*, the Agreement guaranteed that he would receive ... $18 million ...." *Pereira*, 267 B.R. at 505. Cogan cannot attempt to sever the very provision with which this Court took issue. Cogan cannot seek top hat benefits under the 1987 Contract.

### 3. *Oral Contract*

■ As noted above, Cogan was employed until January 2000, even though the renewal of the 1987 Agreement was void as of August 1997. Cogan argues that in the absence of the renewed 1987 Agreement, he had an oral agreement with Trace to provide the top hat benefits. It is unclear whether Cogan claims that he had a separate oral agreement for the top hat provisions, or whether it is part and parcel of his novation theory positing that he was entitled to receive the same salary and benefits as described in the voided 1997 renewal contract. To the extent that Cogan claims that the top hat benefits were part of the entire oral contract that he claims came into being by novation, this argument is rejected for the same reasons discussed below. The issue of whether Cogan and Trace had a separate oral agreement specific to top hat benefits is addressed here.

Cogan fails to detail the basics of this oral contract, including its offer and acceptance, how or when the alleged contract

378

was negotiated, or why an oral contract was necessary. *Metzger, Shadyac & Schwarz v. United States*, 12 Cl.Ct. 602, 604–05 (1987) (affidavit alleging oral agreement insufficient absent evidence of offer and acceptance); *McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 577 (5th Cir. 2000) (proof insufficient when, *inter alia*, proponents "fail to assert exactly when this oral contract arose or when the critical term was agreed upon"). Cogan's proof of the oral "contract" are financial documents promulgated prior to this court's decision last year that the renewal of the 1987 Agreement was invalid. There is no additional written proof that Trace intended for Cogan to receive the top hat benefits in the absence of the 1987 Agreement or its renewal.

Similarly, the testimony of Mamary and Wood proves too little. There is no evidence identifying the source of Cogan's alleged rights, nor is their testimony probative that the claim arose from an oral contract as opposed to a later-invalidated written contract. Similarly, the tax forms show only that a contract was believed to be in existence, not whether it was an oral contract or an invalid written one.

Cogan's affirmative defense for an $8.77 million offset in top hat provisions is dismissed.

### III. COGAN'S EMPLOYMENT POLICY CLAIMS

#### A. The $350,000 Vacation Policy Claim

Cogan has withdrawn this affirmative defense. Therefore, the affirmative defense regarding the offset of $350,000 is dismissed.

#### B. The $3.6 Million Severance Policy Claim

Cogan first claims that "the Court's invalidation of the renewal of the 1987 Agreement as of August 5, 1997 resulted in the continuation of the original terms of Mr. Cogan's employment except on an at-will basis from August 5, 1997 to early 2000." Therefore, he argues, he had "the same entitlement to severance pay that would have otherwise been afforded him under the 1987 Agreement." The underlying premise of this claim is faulty. This Court invalidated the 1997 renewal. Thus, no contract was in place from August 5, 1997 until early 2000. Cogan does not present any evidence of any other "entitlement" to severance pay other than what was in the now-voided contract.

His second claim, relying on Trace's severance policy for executives, carries more weight. It is undisputed that Trace's alleged "severance policy for senior executives" was not set forth in any agreement or other writing. In such circumstances, New York law requires that "to prevail on a claim for severance pay, a former employee must show both that an employer had a regular practice of making severance payments and that the employee relied on the employer's severance pay practices in accepting or continuing his employment." *Bigda v. Fischbach Corp.*, 849 F.Supp. 895, 905 (S.D.N.Y.1994) (citations omitted). The Trustee asserts that Cogan has met neither requirement.

#### 1. Regular Practice

Cogan presents a triable issue of fact as to whether Trace had a regular policy of making severance payments under which he could receive such pay. Nelson affirmed that all Trace senior executives were entitled to a severance payment of at least one year's salary and "sometimes more." Cogan also affirms that from its inception in 1974, Trace had an informal but consistent practice of paying its executives severance.

It is true that the severance differed among executives. However, it was consistently at a minimum the equivalent of one year's salary, and all executives were entitled to severance. Consistent with this practice, Cogan seeks only the minimum severance payment that he would have been entitled to under Trace's policy: one year's severance, or $3.6 million.

In addition, Cogan provided two examples of executives who received severance payment. These executives received the payment pursuant to a written agreement, rather than from an informal agreement such as Cogan alleges. However, these formal agreements may have evidenced the informal practice that Cogan alleges. It is sufficient for the purposes of this summary judgment motion.

**2. *Reasonable Reliance***

▮▮▮ Cogan has also presented a triable issue of fact with regard to whether his reliance on the policy was reasonable. Cogan has the burden to "establish reliance 'unequivocally referable' to the severance pay policy." *Bigda,* 849 F.Supp. at 905 (granting summary judgment for failure to establish 'unequivocally referable' reliance on alleged severance practice); *Gallagher v. Ashland Oil, Inc.,* 183 A.D.2d 1033, 1034, 583 N.Y.S.2d 624 (3d Dep't 1992) (same), *appeal denied,* 80 N.Y.2d 758, 589 N.Y.S.2d 309, 602 N.E.2d 1125 (1992).

For actions to be "unequivocally referable," a party must prove something akin to the familiar negligence principle of "but for" causation. *E.g., Blair v. CBS, Inc.,* 662 F.Supp. 947, 949–50 (S.D.N.Y.1987) (granting summary judgment, on lack of reliance grounds, where plaintiff could not show that employee handbook representations were the "but for" cause of her conduct). *See also James v. Western New York Computing Systems Inc.,* 273 A.D.2d 853, 854–55, 710 N.Y.S.2d 740 (4th Dep't 2000) (limiting term "unequivocally referable" to "extraordinary" conduct that is "explainable only" with reference to the alleged agreement in context of doctrine of part performance to avoid Statute of Frauds).

From 1997 until 2001, neither Cogan nor Trace knew that the 1987 Agreement had not in fact been renewed and was not in place. Given this fact, the Trustee argues that Cogan could not have relied on an alleged oral agreement that he did not think was even necessary. This logic, while neat, poses an unfair burden to Cogan. Cogan relied on a written contract that was later declared invalid. Even though the contract was voided by Cogan's own bad conduct in self-dealing, the fact of his reliance on the invalid written contract, as opposed to an unwritten policy, cannot be dispositive of lack of reliance.

Cogan posits that he relied on this policy in negotiating the terms of the written employment agreement and that the existence of the unwritten severance policy was a necessary condition of his employment. Presumably, Cogan relied on the unwritten policy in that he was assured that even if his written contract was voided for some reason, he might still receive the usual severance package of one year's salary. This showing is sufficient to present a triable issue of fact as to Cogan's reliance.

The Trustee's motion is denied, and the claim remains.

**IV. *NOVATION—ALLEGED $1.1 MILLION OFFSET***

▮▮▮ Cogan claims that because Cogan and Trace "continued to act" as if the 1997 renewal were in effect, there is an implication that they intended to create a new employment agreement with substantially

the same terms as the old agreement under the doctrine of novation.

 Under New York law, a valid novation requires, *inter alia*, "a previously valid obligation" and its "replacement [by] a new one ...." *LCA Leasing Corp. v. Borvig Corp.*, 826 F.Supp. 776, 779 (S.D.N.Y.1993) (*citing Callanan Indus. Inc. v. Micheli Contracting Corp.*, 124 A.D.2d 960, 508 N.Y.S.2d 711 (1986)). It was held earlier that the renewal of the 1987 Agreement in 1997 was not valid and, in fact, was void. Therefore, assuming that the 1987 Agreement was valid, it was not replaced by a new valid agreement. A novation does not lie, and this affirmative defense is dismissed.

It does not matter that Cogan seeks only the alleged $1.1 million in deferred compensation. Whether he seeks to recover based on part of the void contract or its entirety, a novation will not lie because the obligation was not replaced by a new, valid obligation.

Cogan's theory of "continuing performance" presents an intractable problem. It would make it almost impossible to challenge successfully a self-dealing transaction, even though such challenges are an integral part of corporate governance law. As a practical matter, such challenges will come after the improper agreement has been made and, at least to some extent, performed. When that agreement is then voided as impermissibly self-dealing, the self-dealing party need only argue that he had in some way performed to reap the benefits of an illegal contract. Such a rule would render impotent a self-dealing holding.

The claim for a $1.1 million offset is dismissed.

## CONCLUSION

For the foregoing reasons, the Trustee's motion is granted in part and denied in part. The above offsets are dismissed except for Cogan's $3.6 million severance pay claim.

It is so ordered.