Joe A. **BROWN**, Plaintiff,

v.

Jo Anne B. **BARNHART**, Commissioner of the Social Security Administration, Defendant.

No. CIV.A. H035287.

United States District Court,
S.D. Texas,
Houston Division.

March 23, 2005.

thus, the court found that she did not fall within a borderline situation preventing application of the grids).

958

Victor N Makris, Attorney at Law, Bellaire, TX, for Joe A Brown, Plaintiff.

Joseph B Liken, OGC Social Sec Admin, Dallas, TX, for Jo Anne B Barnhart Commissioner of Social Security Administration, Defendant.

## MEMORANDUM AND ORDER

BOTLEY, United States Magistrate Judge.

Pending before the Court are Plaintiff Joe A. Brown ("Brown") and Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration (the "Commissioner"), cross-motions for summary judgment. Brown appeals the determination of an Administrative Law Judge ("the ALJ") that he is not entitled to receive Title II disability insurance benefits. *See* 42 U.S.C. §§ 416(i), 423. Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, it is recommended that Brown's Motion for Summary Judgment (Docket Entry No. 10) be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 12) be granted, and the ALJ's decision denying disability income benefits be affirmed.

### I. *Background*

Brown filed an application for disability insurance benefits with the Social Security Administration ("SSA") on May 31, 2002, alleging disability beginning on March 8, 2002, as a result of disorders of the back (discogenic and degenerative).[1] (R. 17–18, 103–105). After being denied benefits initially and on the reconsideration levels, on October 11, 2002, Brown requested an administrative before an ALJ to review the decision. (R. 87).

A hearing was held on June 4, 2003, in Bellaire, Texas, at which time the ALJ heard testimony from Brown, George Weilepp, M.D. ("Dr.Weilepp"), a medical expert who is a board certified orthopedist, and Karen Nielsen ("Nielsen"), a vocational expert ("VE"). (R. 17, 25–74). In a decision dated June 20, 2003, the ALJ denied Brown's application for benefits. (R. 14–22). On August 8, 2003, Brown appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 9–13). The Appeals Council, on September 19, 2003, denied Brown's request to review the ALJ's determination. (R. 6–8). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Brown filed the instant action on November 18, 2003, seeking judicial

---

**1.** "Discogenic" is caused by derangement of an intervertebral disk. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 510 (29th ed.2000). "Degenerative" is of or pertaining to degeneration. *See id.* at 467.

review of the Commissioner's denial of his claim of benefits. *See* Docket Entry No.1.

## II. *Analysis*

### A. *Statutory Bases for Benefits*

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed.2001). The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n. 1 (5th Cir.1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir.1997). For purposes of Title II disability benefits, Brown was insured for benefits through the date of the ALJ's decision—*i.e.*, June 20, 2003. (R. 17, 21). Consequently, to be eligible for disability benefits, Brown must prove that he was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act. See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a). Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

### B. *Standard of Review*

### 1. *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000).

### 2. *Administrative Determination*

 Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the

record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson,* 309 F.3d at 272; *Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir.1999).

 When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart,* 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir.2001). The court may not, however, reweigh the evidence, try the issues *de novo,* or substitute its judgment for that of the Commissioner. *See Masterson,* 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve". *Id.*

### C. *ALJ's Determination*

 An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 404.1520(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 404.1520(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel,* 209 F.3d 448, 453 (5th Cir.2000); *accord Boyd,* 239 F.3d at 704–05. The claimant has the burden to prove disability under the first four steps. *See Myers,* 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson,* 309 F.3d at 272; *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested. *See Boyd,* 239 F.3d at 705. A finding that a claimant ·is disabled or is not disabled at

any point in the five-step review is conclusive and terminates the analysis. *See id.*

■ The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton,* 209 F.3d at 452; *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990); *Johnson v. Bowen,* 864 F.2d 340, 343 (5th Cir.1988); *Cook v. Heckler,* 750 F.2d 391, 393 (5th Cir.1985). A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel,* 238 F.3d 592, 594 (5th Cir.2001); *accord Newton,* 209 F.3d at 452; *Crowley v. Apfel,* 197 F.3d 194, 197–98 (5th Cir.1999); *Selders,* 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton,* 209 F.3d at 452–53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler,* 707 F.2d 162, 165 (5th Cir.1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if he impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy

....' " *Greenspan,* 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant was insured during the relevant period under consideration.

2. No evidence of substantial gainful activity exists during the relevant period under consideration.

3. The claimant has the following "severe" medically determinable impairments: disorders of the back (discogenic and degenerative).

4. None of the claimant's impairments, either singly or in combination, is attended by clinical or laboratory findings which meet or medically equal the criteria for any impairment set forth in Appendix 1 to Subpart P of Regulations No. 4 ("Listing of Impairments") for presumptive disability, the listed severity criteria being absent.

5. The claimant's testimony of pain, other subjective complaints, and functional limitations is not credible.

\* \* \* \* \* \*

7. The claimant cannot perform his past relevant work.

(R. 21). As to the fifth step, the ALJ concluded:

6. The claimant retains the residual functional capacity to perform restricted medium work that involves the ability to lift up to 20 pounds frequently and 40 pounds occasionally; walk for a total of 6 hours in an 8–hour workday in 2 hour intervals; stand from 1 ½ hours to 2 hours at one

time; and sit without restriction. His functional capacity is also compromised by the inability to work at significant unprotected heights; inability to work around dangerous equipment, inability to climb ladders; inability to perform industrial driving; inability to perform overhead work; and inability to kneel, squat, crawl, or bend on a frequent basis.

\*　　\*　　\*　　\*　　\*　　\*

8. The claimant is a younger individual with a high school or more education.

9. The claimant did not acquire any readily transferable skills in his past work.

10. Under the general framework, the claimant's medical vocational profile approximates Rule 203.29, which warrants a finding of "not disabled."

11. The claimant can perform medium unskilled jobs that exist in significant numbers in the national economy.

12. The claimant has not been under a disability, as defined in the Act, at any time through the date of this decision.

(R. 21–22).

■ This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215; *Myers,* 238 F.3d at 619; *Newton,* 209 F.3d at 452; *Greenspan,* 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Brown's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history.

*See Martinez v. Chater,* 64 F.3d 172, 174 (5th Cir.1995); *Wren v. Sullivan,* 925 F.2d 123, 126 (5th Cir.1991) (citing *DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton,* 209 F.3d at 452; *Brown,* 192 F.3d at 496; *Martinez,* 64 F.3d at 174; *Selders,* 914 F.2d at 617.

## D. *Issues Presented*

Brown claims that the ALJ erred by rejecting the opinion of Brown's treating physician, and also erred by ignoring or misunderstanding evidence favorable to Brown. The Commissioner disagrees with Brown's contentions, maintaining that the ALJ's decision is supported by substantial evidence.

## E. *Review of the ALJ's Decision*

### 1. *Objective Medical Evidence and Opinions of Physicians*

■ When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley,* 493 U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532, 110 S.Ct. 885; *see also* 20 C.F.R. § 404.1520(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley,* 493 U.S. at 536 n. 16, 110 S.Ct. 885; *Loza v. Apfel,* 219

F.3d 378, 393 (5th Cir.2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza,* 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley,* 493 U.S. at 531, 110 S.Ct. 885.

 The claimant has the burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530–31, 110 S.Ct. 885; *Selders,* 914 F.2d at 619. The listings describe a variety of physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. *See Zebley,* 493 U.S. at 529–30, 110 S.Ct. 885. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530, 110 S.Ct. 885. For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* An impairment that manifests only some of the specified criteria, no matter how severe, does not qualify. *See id.*

 For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531, 110 S.Ct. 885 (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 404.1526(a). The applicable regulation further provides:

> (1)(i) If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A) You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B) You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> > (ii) We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 404.1526(a). Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley,* 493 U.S. at 531, 110 S.Ct. 885. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala,* 1 F.3d 357, 364 (5.th Cir.1993)

A review of the medical records submitted in connection with Brown's administrative hearing reveals that he was involved in an on-the-job accident on June 23, 1997, resulting in injury to his back and right shoulder. (R. 151–152). Virgilio C. Car-

andang, M.D. ("Dr.Carandang") examined Brown, noting a cervical spine series revealed a "straightened curve" and "muscle spasm." (R. 150, 218–221). There was no osseous, articular or soft tissue abnormality seen in Brown's right shoulder. (R. 150, 221). Dr. Carandang prescribed medication and physical therapy for his right shoulder and arm pain. (R. 151, 218). In follow-up appointments with Dr. Carandang, Brown continued to complain of pain in his neck and right shoulder. (R. 199–217).

On October 9, 1997, Dr. Carandang ordered an MRI of Brown's cervical spine, which revealed "mild to moderate degenerative changes in the intervertebral discs in the mid cervical region." (R. 148, 210). At that time, there was no evidence of significant stenosis of the spinal canal. (R. 148). An MRI taken on October 9, 1997, of Brown's right shoulder was negative, as there was no evidence of abnormal signal within the supraspinatus tendon and no evidence of free fluid in the subacromial-subdeltoid bursa. (R. 148–149, 210). Only mild degenerative spurring was noted at the acromioclavicular joint. (R. 149).

Dr. Carandang continued to treat Brown for right-sided neck and shoulder pain. (R. 199–210). In November 1997, Dr. Carandang noted that Brown was "motivated to do less physical type work—driving buses." (R. 208). In late-January 1998, Dr. Carandang reported that Brown was "interested in light duty work." (R. 204). Dr. Carandang's assessment at that time was that he was slowly resolving his right-sided neck and shoulder pain, and Dr. Carandang recommended that Brown continue taking his medications, continue home exercises, and consider membership to local fitness center. (R. 204). In February 1998, Dr. Carandang noted that Brown was "interested in resuming driving but he is afraid of having to deal with loads and having to throw heavy chains to tie down tarp." (R. 203).

On April 7, 1998, Dr. Carandang referred Brown to neurologist Jeffrey P. Gaitz, M.D. ("Dr.Gaitz") for a neurological examination. (R. 151–154). Although difficult to read, Dr. Gaitz noted that the MRI's of Brown's shoulder and cervical spine were "within normal limits." (R. 151). Dr. Gaitz further reported that after performing a neurological examination, "[n]o focal or lateralizing neurologic finding [were] identified." (R. 151). Dr. Gaitz' impression was that there was "no evidence of any acute or chronic neurologic problems" at that time. (R. 152). Dr. Gaitz recommended that Brown consult with an orthopedist to rule out further treatable muskuloskeletal disorders involving his right upper extremity. (R. 152).

On April 16, 1998, Dr. Carandang noted that Brown's right-sided neck and shoulder pain were "likely due to Myofascial Pain Syndrome." (R. 201). Dr. Carandang reported that he was referring Brown to Dr. Nixon for an orthopedic consultation. (R. 201). In subsequent visits in May and July 1998, Dr. Carandang continued to note his assessment of Myofascial Pain Syndrome. (R. 199, 200). On July 9, 1998, Dr. Carandang reported that Brown "had been able to do some limited work." (R. 199).

In November 2001, reportedly while working inside a trailer at a warehouse (R. 48–49), Brown "raised his arm and pulled a muscle, and his lower back hurt the first time." (R. 166). Brown continued working and did not seek treatment until March 2002. (R. 50).

On March 28, 2002, Brown visited Unal K. Gurol, M.D. ("Dr.Gurol"), an internist, complaining of "lower back pain radiating to the left leg." (R. 166). Dr. Gurol noted that Brown reported that he had not had any kind of problems in the past. (R. 166).

Dr. Gurol observed Brown's lumbar spine and sciatic cords to be tender. (R. 166). Brown's neurological, gait, and vascular examination were normal. (R. 166). An x-ray of Brown's lumbar spine showed narrowing between L5–S1. (R. 166). Dr. Gurol's impression was possible disc disease. (R. 166). She prescribed medication to Brown and recommended ten days rest. (R. 166).

On April 11, 2002, Brown returned to Dr. Gurol for a follow-up visit, claiming that he could not work, could not lift, his lower back and side were tender, and the medication prescribed did not alleviate the pain. (R. 164). Dr. Gurol referred Brown for a cat scan of the lumbar spine, which revealed disc bulge at L5–S1 and L4–5. (R. 164–165, 197). On April 18, 2002, a cat scan was performed, revealing disc bulge at L5–S1 and L4–5. (R. 165, 196). On April 19, 2002, Brown returned to Dr. Gurol for a follow-up examination, complaining of muscle pain. (R. 163). Dr. Gurol noted that Brown had disc disease.[2] (R. 163). Dr. Gurol referred Brown to neurologist David E. Tomaszek, M.D. ("Dr.Tomaszek") for a trigger point injection for the pain. (R. 161, 163).

On May 17, 2002, Dr. Tomaszek performed a left S1 foraminal root block on Brown. (R. 155–156). On May 20, 2002, Dr. Gurol wrote a letter, "To whom it may concern," regarding her treatment and opinion of Brown's back pain. (R. 161). Dr. Gurol noted that x-rays revealed disc disease at L4–5 and L5–S1, which she thought could be treated conservatively with medication; however, the medications prescribed did not help Brown. (R. 161). Dr. Gurol reported that an MRI performed on Brown revealed "disc herniation and some stenosis." (R. 161). According to Dr. Gurol, after his trigger point injec-

tion, "Brown still had numbness and weakness in his legs, pain in the posterior aspect of the legs, and lower back pain which bothers the patient constantly, especially when he walks." (R. 161). Dr. Gurol opined that "[m]ost likely this patient will need surgery and absolutely this back problem was induced by his job and job related problems. The patient's prognosis is guarded. Even with surgery, we cannot know if the patient will completely recover from the back and leg problems." (R. 161). On May 21, 2002, Brown saw Dr. Gurol complaining of back pain, despite the medication, physical therapy, and trigger point shot. (R. 184). Dr. Gurol's assessment was radiculopathy and nerve root syndrome. (R. 184).

In July 2002, Brown visited Dr. Gurol for a check-up and needing a "letter." (R. 183). He reported that he still had "some muscle spasms" and that "pain radiates to both legs and the sensation in the legs are sometimes decreased and he cannot walk though." (R. 183). Dr. Gurol's assessment was that he had lower back syndrome and disc disease. (R. 183).

In August 2002, Brown was referred to Balakrishna Reddy Mangapuram, M.D. ("Dr. Mangapuram") by the Texas Rehabilitation Commission for a consultative examination. (R. 168). Dr. Mangapuram examination revealed normal neurological functions. (R. 168–170). Dr. Mangapuram noted Brown's range of motion of all joints was normal. (R. 169). There was no evidence of any muscle atrophy or joint swelling. (R. 169). He was able to bend down to pick up a pencil from the floor. (R. 169). Dr. Mangapuram further noted that Brown's right and left shoulder movement was normal. (R. 169). Brown was able to lift his right arm above his head

---

**2.** "Degenerative disease" is a disease characterized by the progressive impairment of the function of an organ or organs and not attrib-

utable to some cause such as an infection or a metabolic defect. *See* GOULD'S MEDICAL DICTIONARY 363 (4th ed.1979).

and had normal rotational movement of the right shoulder. (R. 169). Brown had normal grip strength. (R. 169). His ability to reach, handle, finger and feel were normal. (R. 169). Dr. Mangapuram reported that x-rays of Brown's cervical spine revealed mild degenerative changes at C5–6. (R. 170–171). The lumbar spine x-rays revealed degenerative changes. (R. 170–172). The thoracic spine x-rays revealed mild degenerative changes. (R. 170, 172–173).

On May 23, 2003, Dr. Gurol completed a Lumbar Spine Residual Functional Capacity Questionnaire, a Physical Residual Functional Capacity Questionnaire, and a questionnaire regarding "Listing 1.04A—Spinal Nerve Root Compression." (R. 186–188, 189–192, 193–196). According to Dr. Gurol, Brown is not capable of performing work activity on a sustained basis due to lumbar spine disease, lumbar spine stenosis,[3] and bilateral neuropathy[4] and radiculopathy.[5] (R. 186–196).

At the administrative hearing, Brown testified that he experienced numbness in his legs and right hand, as well as problems related to his neck, shoulder and lower back. (R. 36, 40–41, 44–45). He admitted he was able to use his upper extremities to reach up and get a plate from a cabinet. (R. 45). Brown also acknowledged being able to lift a gallon of milk. (R. 46). He alleged an inability to stand for more than 15 to 20 minutes at one time or walk more than 1/2 block. (R. 36). He maintained that he could sit for about an hour or two. (R. 35, 44). He denied being able to do yard work or housework. (R. 37–38). He stated that if he dropped something he could stoop to pick it up. (R. 44).

 "[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist. *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir.1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211. It is well settled that even

**3.** "Spinal Stenosis" is the narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space. *See* DORLAND's, *supra*, at 1698.

**4.** "Neuropathy" is a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to non-inflammatory lesions known as opposed to those of neuritis; the etiology may be known or unknown. *See* DORLAND's, *supra*, at 1212.

**5.** "Radiculopathy" is a disease of the nerve roots. *See* DORLAND's, *supra*, at 1511.

though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

 In the case at bar, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Brown suffered from impairments which did not meet or equal the requirements of a Listing in Appendix 1. (R. 18, 66). Here, the ALJ appropriately gave Brown's treating physician's (*i.e.*, Dr. Gurol's) opinion that she observed "some stenosis" (R. 161) less deference because her conclusions were not supported by objective medical evidence.[6] *See Scott*, 770 F.2d at 485. Indeed, Dr. Weilepp testified that Brown had "back disease, long-standing," at multiple levels. (R. 57). Dr. Weilepp reported that Brown's back disease referred to "minimal objective deficiencies;" however, he noted activity-related, anti-gravity-related symptomatology, which was radicular in type. (R. 57). Absent were atrophy, neurological sequelae or reflex changes. (R. 57). Dr. Weilepp observed that Brown's response to straight leg raising was significant and positive on multiple occasions; however, he noted that it is best defined by an MRI and Cat Scan, which reportedly were done, but were not made part of the record evidence. (R. 57). Dr. Weilepp further observed that "lumbar spine films showed the disc spaces [were] not narrowed significantly except at 5F–4" and that there was mild evidence of osteophytes at L4 and L5. (R. 57–58). Dr. Weilepp, who is a board-certified orthopedist, disagreed with Dr. Gurol's assessment of Brown because Dr. Weilepp found there was no objective evidence of spinal stenosis. (R. 18, 58, 66). Based on an MRI taken April 18, 2002 (R. 165, 197), Dr. Weilepp testified that he did "not see any evidence of stenosis." (R. 58). Summarizing the MRI, Dr. Weilepp observed that there was contact with an S1 nerve and the L5, S1, moderate hypertrophic changes at the facets. (R. 58). In this regard, Dr. Weilepp stated that compression of the thecal sac with degenerative back disease was not uncommon. (R. 58).

In sum, the record is missing some objective form of testing to support Dr. Gurol's assessment of Brown's limitations. (R. 19, 57–58, 66). Due to the absence in the record of objective factors and medical evidence to support Brown's alleged symptoms and limitations, the ALJ had good cause to discount the weight of Brown's treating physician's opinions in favor of Dr. Weilepp's assessment. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456 (citing *Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211).

### 2. *Subjective Complaints*

 The law requires the ALJ to make affirmative findings regarding claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir.1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648–49 (5th Cir.1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir.1995) (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the indi-

---

6. Brown also argues that Dr. Tomaszek's observation of mild lumbar paravertebral muscle spasms in May 2002 (R. 157), is a "clear sign of musculoskeletal pathology." Support for Brown's contention, however, is not present in the record evidence.

vidual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n. 2 (5th Cir.1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 & n. 18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir.1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281–82 (5th Cir.1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir.1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir.1986).

 As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir.1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C.Cir.1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir.1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir.1985).

 For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from

the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James v. Bowen*, 793 F.2d 702, 706 (5th Cir.1986). However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir.2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Brown testified regarding his complaints of pain. (R. 35–48, 53–54). The ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Brown's pain.

> The undersigned weighs the credibility and consistency of the claimant's allegations with clinical and laboratory findings, as well as with other extrinsic factors and statements, and the entire record. The claimant's alleged limitations are not credible according to the objective evidence of record and his testimony. There simply is no objective corroboration to many of his symptoms. As noted, those symptoms are not sufficient to support total disability.
>
> * * * * * *
>
> While no one factor was determinative, the following factors in combination were indicative of a finding the claimant's subjective complaints, including pain, were not corroborated in severity, duration and intensity as to support a finding of "total disability" as the claimant alleges:
>
> 1. The claimant's reported activities are not shown to be consistent with his claim of total disability. Even though he alleged injury in November 2001 [R. 49], he testified he rode horses and saddled them in December 2001. [R. 47]. He denied performing any activity around

or outside his home [R. 43, 46] but in March 2002 he reported he was working in his yard (See Exhibit 4F, page 10) [R. 167].

2. The claimant testified he takes prescription medication for pain control only on an as needed basis. [R. 54]

3. The claimant is not receiving or seeking frequent medical treatment, which tends to undermine his allegations of incapacitating symptoms.

4. The objective medical evidence is not consistent with total disability.

(R. 19). Likewise, Brown testified that he played basketball, shooting free throws, until February 2002. (R. 47–48). Such inconsistent testimony by Brown supports the ALJ's finding that Brown's testimony of pain, other subjective complaints, and functional limitations was not credible. (R. 19, 21).

■■■ The Court does not doubt that Brown suffers from pain; however, the records do not support a finding that Brown's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. Despite his allegations of constant pain, Brown testified that he did not want to continue taking the trigger point injections in his back because "[t]hose are painful shots. And I'd rather have my surgery than to keep taking those." (R. 52–53). Brown testified, however, that he has not had back surgery because his insurance has expired. (R. 30, 34–35). Brown has presented no evidence that he tried to seek, but was denied, indigent health care during this time frame. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir.1999) (claimant must demonstrate that he attempted to receive indigent health care) (citing *Murphy v. Sullivan*, 953 F.2d 383, 386–87 (8th Cir.1992) (it is inconsistent with the degree of pain and disability asserted where no evidence exists that claimant attempted to find any low cost or no cost medical treatment for alleged pain and disability)). As such, the ALJ's conclusion that Brown's alleged limitations and symptoms were not credible is supported by substantial evidence.

### 3. *Residual Functional Capacity*

■■■ Under the Act, a person is considered disabled:

only if his physical or mental impairment or impairments are of such severity that his is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for his, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir.2000).

■■■ To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir.1990); *see also* 20

C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir.1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir.1995).

■ In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96–8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474–01 (July 2, 1996). The court further commented:

> Second, SSR 96–9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96–9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter v. Heckler,* 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Mathews,* 545 F.2d 975, 977–78 (5th Cir.1977)).

■ In the instant case, the ALJ, relying on the record evidence and Dr. Weilepp's testimony, determined that Brown retained the residual functional capacity to perform restricted medium work that involved the ability to lift up to 20 pounds frequently and 40 pounds occasionally; walk for a total of 6 hours in an 8–hour workday in 2 hour intervals; stand from 1½ hours to 2 hours at one time; and sit without restriction. (R. 18, 20–21, 58). The ALJ further found that Brown's functional capacity was compromised by the inability to work at significant unprotected heights; inability to work around dangerous equipment; inability to climb ladders; in ability to perform industrial driving; inability to perform overhead work; and an inability to kneel, squat, crawl, or bend on a frequent basis. (R. 18, 20–21, 58). Recognizing that Brown's ability to perform all or substantially all of the requirements of medium work was impeded by additional exertional and/or non-exertional limitations, the ALJ elicited testimony from a VE to determine whether or not there were a significant number of jobs in the national economy that Brown could perform given his residual functional capacity and other vocational factors. (R. 20–21, 71–73).

The VE testified that Brown would not be able to perform his past relevant work as a driver, which was at a medium exertion level and semi-skilled. (R. 20–21, 71–72). The VE further testified that Brown had no transferable skills. (R. 20–21, 72). The VE stated, however, that he would be able to perform other types of work, incorporating the limitations Dr. Weilepp indicated. (R. 20–21, 72). Given all of these factors, the VE stated that Brown could work the following unskilled jobs, that existed in significant numbers in the national and local economy: inspector, grinder, and checker. (R. 20, 73). The VE testified that these jobs exist in the many thousands in the national economy. (R. 72). In his decision, the ALJ found the VE's testimony to be credible and persuasive. (R. 20). Thus, taking into consideration the VE's testimony and the "general framework" of Grid Rule 203.29, the ALJ found that Brown could perform jobs existing in significant numbers in the national economy.

Brown argues that the ALJ misinterpreted the significance of a limitation to occasional stooping because medium-level jobs "usually" require frequent stooping and, according to Brown, "the vast majority of medium jobs" require frequent stooping. *See* Docket Entry No. 11, at 6–7. Contrary to Brown's assertion, the ALJ acknowledged in his decision that Brown could not perform the full range of medium work activity. (R. 20). Moreover, the ALJ obtained VE testimony to determine the jobs available to Brown with his restricted work capacity. (R. 71–73). As set forth above, the VE identified significant numbers of medium-level jobs that Brown could perform despite his limitations, including restrictions on stooping. (R. 71–72). Brown, who was represented by counsel at the hearing, did not dispute the VE's characterization of these jobs. (R. 73). Consequently, the evidence before the ALJ, reflects that Brown was capable of engaging in substantial gainful activity,

precluding a finding of disability within the parameters of the Act.

### III. *Conclusion*

Accordingly, it is therefore

**ORDERED** that Brown's Motion for Summary Judgment (Docket Entry No. 10) is **DENIED**. It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No 12) is **GRANTED**. It is finally

**ORDERED** that the Commissioner's decision denying Brown disability benefits is **AFFIRMED**.

### *FINAL JUDGMENT*

In accordance with the Memorandum and Order issued this day, it is hereby

**ORDERED** that Plaintiff Joe A. Brown's Motion for Summary Judgment (Docket Entry No. 10) is **DENIED**. It is further

**ORDERED** that the Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration, Motion for Summary Judgment (Docket Entry No. 12) is **GRANTED**. It is finally

**ORDERED** that this matter is **DISMISSED WITH PREJUDICE**.